IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FEDERAL INSURANCE COMPANY | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. RDB-14-3794 |
| MATHEWS BROTHERS, LLC, and ALBAN TRACTOR CO., INC | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff Federal Insurance Company ("Plaintiff" or "Federal") filed a ten-count Complaint (ECF Nos. 1) against Defendants Mathews Brothers, LLC ("Mathews") and Alban Tractor Company, Inc. ("Alban") (collectively "Defendants") asserting negligence and breach of warranty claims arising out of a sunken vessel. Currently pending before this Court is Defendant Mathews's Motion to Dismiss (ECF No. 9) and Defendant Alban's Motion to Dismiss (ECF No. 11). The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons that follow, Defendant Mathews' Motions to Dismiss (ECF Nos. 9) is GRANTED and Defendant Alban's Motion to Dismiss (ECF No. 11) is GRANTED. Accordingly, this case is DISMISSED as to all defendants.

BACKGROUND

This Court accepts as true the facts alleged in the plaintiff's complaint. *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011). This case arises out of damage totaling $750,000 to the yacht RIVER RAT ("RIVER RAT" or "the vessel"). *See generally* Compl.

Federal is a foreign corporation authorized to do business in the State of Maryland. *Id.* ¶ 3. Mathews is a Maryland corporation that manufactured the vessel and sold it to Mr. and Mrs. Ratcliffe,[1] who subsequently sold it to Mr. Rardin. *Id.* ¶ 5. Alban is a Maryland corporation that manufactures and installs marine engines and related parts. *Id.* ¶ 6.

Between October of 2007 and June of 2009, Mathews built the RIVER RAT for its original owners, the Ratcliffes. *Id.* ¶ 8. During the vessel's construction, Mathews contracted with Alban to supply and install the vessel's engine, along with other parts and fittings. *Id.* Mathews physically placed the engine in the vessel, and approximately eight months later, Alban completed final "hook ups" and accessory installations involving the fuel cooler and seawater cooling discharge line. *Id.* In June of 2009, Alban conducted a "PAR Test" to assure that the engine and the installation met Alban standards. *Id.* ¶ 9. When the test showed the engine's performance was unacceptable, Alban installed a replacement engine. *Id.*

In May of 2012, Mr. Ratcliffe passed away and his estate sold the RIVER RAT to Mr. Rardin. *Id.* ¶ 10. Mr. Rardin subsequently insured the vessel with Federal. *Id.* ¶ 3. Mr. Rardin never made any alterations to the vessel's engine or any of its related fittings. *Id.* On May 27, 2013, after docking the vessel, Mr. Rardin noticed that it was taking on water and sinking. *Id.* ¶ 11. As a result, Mr. Rardin was unable to get the boat completely on the boat lift, and eventually the boat sunk in approximately four to five feet of water. *Id.* A subsequent investigation revealed that the cause of the sinking was "the improper installation of the fuel cooler discharge line to the engine exhaust elbow which caused the nipple fitting to break

---

[1] The Complaint refers to the original owners as both the "Radcliffes" and "Ratcliffes." Subsequently, the Plaintiff consistently uses the name "Ratcliffes" in its responsive papers, thus this Court will do the same.

and consequential leakage of seawater into the boat." *Id.* ¶12. Allegedly, the installation of the fuel cooler discharge line was improper because:

> A. The nipple fitting serving the fuel cooler seawater discharge line connection to the engine exhaust elbow was not suitable for use in the application in which it was deployed.
> B. The fuel cooler seawater discharge line connection to the engine exhaust elbow, being comprised of five fittings, created complications and greater risks for failure due to over-tensioning, loading, vibration and corrosion.
> C. The nipple fitting that broke appears to have been comprised of common "yellow" brass, which is inferior to marine grade bronze. Using yellow brass constitutes a defect in workmanship and assembly as the material selection is unsuitable for the application in which the fitting was deployed.
> D. Using five fittings to connect the fuel cooler seawater discharge line to the exhaust elbow qualifies as a defect in workmanship and assembly in that the exhaust elbow should have been fabricated with a welded pipe to accommodate connecting the flexible hose serving the fuel cooler discharge using marine grade hose clamps.

*Id.* ¶ 12. Due to the sinking, the vessel required repairs totaling over $750,000. *Id.* ¶ 16. Because Mr. Rardin's policy with Federal had hull limits of $750,000, that amount plus $25,000 for other costs was paid by Federal under the insurance contract, and Federal is now subrogated to the rights of Mr. Rardin. *Id.* ¶ 17.

Federal filed this action seeking $775,000 in damages plus interests and costs from Defendants. The ten-count Complaint asserts five claims against Mathews and the same five claims against Alban: breach of express warranty (Counts I and VI); breach of implied warranty of merchantability (Counts II and VII); breach of implied warranty of fitness for a particular purpose (Counts III and VIII); negligence (Counts IV and IX); and breach of

warranty of workmanlike performance (Counts V and X).[2] Both Defendants move to dismiss all counts against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Supreme Court's recent opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "require that complaints in civil actions be alleged with greater specificity than previously was required." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). In *Twombly*, the Supreme Court articulated "[t]wo working principles" that courts must employ when ruling on Rule 12(b)(6) motions to dismiss. *Iqbal*, 556 U.S. at 678. First, while a court must accept as true all the factual allegations contained in the complaint, legal conclusions drawn from those facts are not afforded such deference. *Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim); *see also Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) ("Although we are constrained to take the facts in the light most favorable to the plaintiff, we need not accept

---

[2] Plaintiff asserts Counts I-V against Mathews and Counts VI-X against Alban.

4

legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." (internal quotation marks omitted)).

Second, a complaint must be dismissed if it does not allege "a plausible claim for relief." *Iqbal*, 556 U.S. at 679. Although a "plaintiff need not plead the evidentiary standard for proving" her claim, she may no longer rely on the mere possibility that she could later establish her claim. *McCleary-Evans v. Maryland Department of Transportation, State Highway Administration*, 780 F.3d 582, 584 (4th Cir. 2015) (emphasis omitted) (discussing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) in light of *Twombly* and *Iqbal*). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. While the plausibility requirement does not impose a "probability requirement," *id.* at 556, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012) ("A complaint need not make a case against a defendant or *forecast evidence* sufficient to *prove* an element of the claim. It need only *allege facts* sufficient to *state* elements of the claim." (emphasis in original) (internal quotation marks and citation omitted)). In making this assessment, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. *Iqbal*, 556 U.S. at 679. "At bottom, a plaintiff must nudge [its] claims across the line from conceivable to plausible to resist dismissal." *Wag More Dogs, LLC*, 680 F.3d at 365 (internal quotation marks omitted).

ANALYSIS

Plaintiff's Complaint asserts five causes of action against each Defendant under theories of breach of warranty and negligence. In their respective Motions to Dismiss, Defendants Mathews and Alban raise a variety of issues, including procedural defects, lack of privity, and other substantive issues. This Court will address claims in the following manner. First, this Court will consider whether § 2-725 of the Maryland Commercial Law Code or § 5-101 of the Maryland Courts and Judicial Proceedings Code, and their respective statutes of limitations, govern Counts I-III and VI-VIII. Next, this Court will determine whether the economic loss rules bars Plaintiff's negligence claims (Counts IV and IX). Finally, this Court will address whether Plaintiff fails to state a claim against either Defendant for breach of workmanlike performance (Counts V and X).

## I. Statute of Limitations as to Counts I-III and Counts VI-VIII

It is undisputed that Maryland law applies to Plaintiff's claims of breach of express warranty (Counts I and VI), breach of implied warranty of merchantability (Counts II and VII), and breach of implied fitness for a particular purpose (Counts III and VIII). *See Ace American Ins. Co. v. Grand Banks Yachts, Ltd.*, 587 F. Supp. 2d 697, 704 (D. Md. 2008) ("It is well established that the contract for the sale of a yacht is a non-maritime contract . . . As a federal court sitting in diversity, the court applies Maryland's choice of law rules."); *see also Polestar Maritime Ltd. v. Nanjing Ocean Shipping Co. Ltd.*, 631 F. Supp. 2d 304, 308 (S.D.N.Y. 2009) ("Contracts for the sale of ships are not cognizable in admiralty. Similarly, a breach of warranty in the sale of a vessel does not state a cause of action in admiralty either.") (citations omitted).

This Court must decide, however, whether the Maryland Uniform Commercial Code ("UCC") or Courts and Judicial Proceedings Code controls these claims. Defendants argue that Md. Code Ann., Com. Law § 2-725 applies to the breach of warranty claims. Under § 2-725, a four-year statute of limitations runs from the date of tender of delivery to the original owner. Md. Code Ann., Com. Law § 2-725. Such a statute of limitations would bar these claims. In contrast, Plaintiff asserts that Md. Code Ann. Cts & Jud. Proc. § 5-101 governs both contracts. § 5-101 imposes a three-year statute of limitations that begins to run according to Maryland's "discovery rule." Md. Code Ann., Cts & Jud. Proc. § 5-101.

The UCC applies to "transactions in goods." Md. Code Ann., Com. Law § 2-102. A good is something that is "movable at the time of identification to the contract for sale." *Id.* § 2-105(1). If a contract involves the mixture of both goods and services, courts look to the "predominant purpose" of the contract to determine whether the UCC controls. *See Burton v. Artery Co., Inc.*, 367 A.2d 935 (Md. 1977) (adopting the "predominant purpose" test articulated by the United States Court of Appeals for the Eighth Circuit in *Bonebrake v. Cox*, 499 F.2d 951 (8th Cir. 1974)); *see also Lohman v. Wagner*, 862 A.2d 1942, 1046 (Md. Ct. Spec. App. 2004) (applying the "predominant purpose" test to determine whether the UCC applied to a mixed contract). As set forth in *Bonebrake*, this test asks

> not whether [the contracts] are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (*e.g.*, contract with artist for painting) or is a transaction of sale, labor incidentally involved (*e.g.*, installation of a water heater in a bathroom).

499 F.2d at 960 (footnotes omitted). In other words, the mere fact that labor is required to install or deliver a good does not remove the contract from the purview of the UCC.

In this case, the contracts at issue are (1) the contract between Mathews and the Ratcliffes, the original owners of the RIVER RAT, and (2) the contract between Mathews and Alban regarding the vessel's engine. These contracts are mixed contracts in that Defendants were to provide goods, but also to perform certain services in fulfillment of the transactions in goods. The contracts are mixed, but whether they are mixed is not the inquiry of the *Burton-Bonebrake* test. *See Bonebrake*, 499 F.2d at 960. Instead, this Court looks to the "predominant factor" or "thrust" of the subject contracts. Under the first contract, Mathews built the vessel and then sold it to the original owner, the Ratcliffes. Compl. ¶ 5. During the vessel's construction, Mathews subcontracted with Alban to supply and install the engine. *Id.* ¶ 8. Any labor performed by either Defendant was incidental to the main objective of the contracts, which was to provide a yacht and an engine, respectively. Under the *Burton-Bonebrake* test, these sales were the "thrust," and thus UCC controls.

To rebut the application of the UCC, Plaintiff argues that the service aspects of the contracts predominated, "as evidenced by Alban's involvement in the installation [of the Caterpillar engine] and sea trial process," (Pl.'s Resp., 8, ECF No. 13), and "Mathews Brothers['s] alleged supervision of that process," (Pl's Resp., 4, ECF No. 14). Federal contends that this case is analogous to the decision of the Maryland Court of Appeals in *Anthony Pools, a Div. of Anthony Indus., Inc. v. Sheehan*, 455 A.2d 434 (1983). In *Anthony Pools,* the plaintiffs sought to recover damages from the manufacturer and builder of a swimming pool and diving board after one of the plaintiffs fell from the side of the diving board. *Id.* In the case of a contract for "the construction of an inground, steel reinforced, gunite swimming pool with hand finished plaster surfacing, tile trim and coping," the Court of

8

Appeals held that the predominant thrust was "the furnishing of labor and service by [the defendant], while the sale of the diving board was incidental to the construction of the pool itself." *Id.* at 439. As the predominant purpose of the contract was the rendering of services, the UCC did not apply. *Id.*

Yet, the subject action is factually distinguishable from *Anthony Pools*. In *Anthony Pools*, the parties contracted to construct a pool, not to sell a diving board. The good at issue—the diving board—was merely a subsidiary element of the services rendered. The pool, as it was not "movable at the time of identification to the contract for sale," was not itself a good. Md. Code Ann., Com. Law § 2-105(1). The Ratcliffes and Mathews, and Mathews and Alban, however, contracted to provide certain goods—the vessel and the engine. The Ratcliffes sought a yacht, and Mathews sought an engine, where any necessary labor was of secondary concern. Federal's emphasis of the service of installing the engine does not transform these contracts into ones predominantly for a service.[3] *See East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, n.7 (1986) (explaining that contracts "relating to the construction of or supply of materials to a ship" and warranty claims grounded in such contracts are governed by state law and "[i]n particular the Uniform Commercial Code . . . would apply"); s*ee also RMS Technology, Inc. v. TDY Industries, Inc.*, 64 Fed. Appx. 853, 856 (4th Cir. 2003) (finding that when the defendant agreed to manufacture specialized military equipment and then pass title for that equipment to another party, that sort of contract was

---

[3] Moreover, Plaintiff's arguments with regards to how the installation was improper all relate to a defective product: "the nipple fitting . . . was not suitable," "the fuel cooler seawater discharge line connection . . . created complications," "the nipple fitting that broke appears to have been comprised of common 'yellow' brass, which is inferior," and "the exhaust elbow should have been fabricated with a welded pipe." Compl. ¶ 12.

9

"necessarily one for the sale of goods and is properly governed by the UCC"). *Anthony Pools* is thus inapposite, and the UCC governs the subject contracts.

As the UCC controls, its four-year statute of limitations applies to Plaintiff's claims. Md. Code Ann., Com. Law § 2-725. According to the Complaint, the vessel was tendered to its first purchaser, the Ratcliffes, in June of 2009. Compl. ¶ 3. The four-year period therefore ended in June of 2013. Federal filed the instant action on December 5, 2014, over eighteen months after the statute of limitations expired. *See generally id.* Plaintiff's claims are thus barred and must be dismissed under Rule 12(b)(6). Accordingly, Defendant Mathews's Motion to Dismis is GRANTED as to Counts I, II and III,[4] and Defendant Alban's Motion to Dismiss is GRANTED as to Counts VI, VII and VIII.[5]

## II. Negligence Claims (Counts IV and IX)

Next, Federal asserts claims of negligence against Mathews and Alban (Counts IV and X, respectively). Federal alleges that Mathews failed to conform to its "legal duty and obligation . . . to exercise reasonable care in its construction of the RIVER RAT." Compl. ¶¶ 37-38. Similarly, Alban failed to meet its "legal duty and obligation . . . to exercise reasonable care in its manufacture, design and installation of the Caterpillar engine." *Id.* ¶¶ 59–60. Both Mathews and Alban contend that the economic loss rule of admiralty law bars Plaintiff's negligence claims.

---

[4] In the alternative, Mathews argues that Counts I and III fail for lack of privity and Count III additionally fails because the vessel's use was not "particular." As the applicable statute of limitations bars both counts, this Court need not reach these supplemental arguments.

[5] In the alternative, Alban argues that Counts VI, VII and VIII are barred by a warranty disclaimer, Count VI fails for lack of privity, and Count VIII fails because the vessel's use was not "particular." As the UCC's statute of limitations bars all three counts, this Court need not reach Alban's alternative arguments.

While state law governs the breach of express warranty, breach of implied warranty of merchantability, and breach of implied fitness for a particular purpose claims, admiralty law controls the tort claims. *See Ace American Ins. Co. v. Grand Banks Yachts, Ltd.*, 587 F. Supp. 2d 697, 700 (D. Md. 2008) (explaining that, in a damages suit against a hull manufacturer, admiralty law applied to the plaintiff's tort claims, whereas state law governed the breach of warranty claims (citing *Sisson v. Ruby*, 497 U.S. 358, 359 (1990))). Under admiralty law, the economic loss rule generally prevents a party from recovering in tort when a defective product harms only the product itself. *See East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 871 (1986) (holding that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability to prevent a product from injuring itself."). In *Ace American*, this Court has extended the *East River* rule to the non-commercial context. 587 F. Supp. 2d at 701 (citing *Reliance Ins. Co. v. Carver Boat Corp.*, No. CIV. A. WMN-96-194, 1997 WL 714900, at *2 (D. Md. May 29, 1997)). Applying this rule to the non-commercial context derives from the notion that, "[i]n the absence of personal injury or damage to other property, there is no reason to upset the parties' bargain as to their contractual responsibilities and corresponding purchase price." *Federal Ins. Co. v. Lazzara Yachts of North America, Inc.*, No. 8:09-CV-607-T-27MAP, 2010 WL 1223126, at *4 (M.D. Fl. Mar. 25, 2010) (citing *East River*, 476 U.S. at 872).

In this case, the damages Federal seeks arise only from damage to the vessel itself, not from damage to any persons or other property. Under the economic loss rule, Plaintiff thus may not recover in tort. Federal's argument that the economic loss rule is inapplicable is unpersuasive. It contends that its negligence claims survive because the damage was the

11

result of a defective service rather than a defective product. This distinction, however, is irrelevant. *Emp'rs Ins. of Wausau v. Suwannee River Spa Lines, Inc.*, 866 F.2d 752, 755 (5th Cir. 1989). As the Court of Appeals for the Fifth Circuit explained, "the economic loss rule adopted in the *East River* case precludes recovery in maritime tort for purely economic loss stemming from the negligent performance of a contract for professional services where those services are rendered as a part of the construction of a vessel." *Id.* When a party "provides professional services as part of the manufacture or construction of a product[, it] has no duty in maritime tort, independent of its contractual obligations, to prevent the product from injuring itself." *Id.* at 767.

Although the Fourth Circuit has yet to speak authoritatively on this issue, this Court is persuaded by the reasoning of the Fifth Circuit. *See also Gulf Boat Marine Services, Inc. v. George Engine Co., Inc.*, 659 F.Supp. 6, 7 (E.D. La. 1986) (dismissing a negligence claim for improperly repairing an engine or repairing it with defective parts because "[t]he event giving rise to plaintiffs' lawsuit was the failure of the engine, resulting in purely economic losses"); *accord Hudson River Cruises Inc. v. Bridgeport Drydock Corp.*, 892 F. Supp. 380, 386 (D. Ct. 1994) (holding that the economic loss rule applied in the case where "[t]he parties' relationship is governed by a service contract" (citing *Emp'rs Ins. of Wausau*, 866 F.2d at 765)). Any alleged negligence in this case stemmed from services performed during the construction of the RIVER RAT. Defendants had contractual obligations, but no independent tort obligations when the vessel "injur[ed] itself." *Id.* Plaintiff does not allege any damage other than that to

the vessel, which is the "product itself."[6] This Court therefore holds that the economic loss rule bars the negligence claims of Counts IV and IX.[7] Accordingly, Defendant Mathews's Motion to Dismiss is GRANTED as to Count IV and Defendant Alban's Motion to Dismiss is GRANTED as Count IX.

### III. Breach of Warranty of Workmanlike Performance

Finally, Federal alleges claims of breach of warranty of workmanlike performance against Mathews and Alban (Counts V and X, respectively). Specifically, Plaintiff claims that Defendants' "breach of [their] maritime warranty of workmanlike performance given to Rardin, pursuant to the aforesaid contract with the original owner" proximately caused Plaintiff's damages. Compl. ¶¶ 42, 64. Regarding Mathews, Federal asserts a warranty "to properly construct the RIVER RAT and properly install the engine and engine accessories." *Id.* ¶ 42. Alban contracted "to properly manufacture, design and install the Catepillar engine and engine accessories in the RIVER RAT." *Id.* ¶ 64. Both Defendants argue that the warranty of workmanlike performance inapplicable to either contract because neither contract was for maritime services.[8]

The implied warranty of workmanlike performance originates in the United States Supreme Court's decision in *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.*, 350 U.S. 124

---

[6] *See Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 877 (1997) (explaining for a tort claim against the manufacturer of a vessel and the designer of the vessel's hydraulic system that "all agree that the 'product itself' consists at least of a ship as built and outfitted by its original manufacturer and sold to an initial user").

[7] While Plaintiff attempts to argue, at least with respect to Mathews, that if "this Court applies the economic loss rule [then] Matthews (sic) Brothers would be able to artificially insulate itself from its negligent conduct from downstream consumers," *East River* addressed this concern. As the Court explained, "[p]ermitting recovery for all foreseeable claims for purely economic loss could make a manufacturer liable for vast sums. It would be difficult for a manufacturer to take into account the expectations of persons downstream who may encounter its product." *East River*, 476 U.S. at 874.

[8] In the alternative, Alban contends that Count X fails for lack of privity and because it is barred by a warranty disclaimer. As this Court holds that Plaintiff's claim for breach of warranty of workmanlike performance does not apply to Alban's contract, this Court need not reach the alternative arguments.

(1956). In *Ryan Stevedoring*, the Court concluded that the breach of this warranty entitled a ship owner to indemnity from a stevedore. Essentially, the warranty of workmanlike performance "is an admiralty application of the contract rule that one who undertakes to perform a service does so with the implicit agreement to perform in a workmanlike fashion." *Commercial Union Ins. Co. v. Bohemia River Assocs, Ltd.*, 855 F. Supp. 802, 806–807 (D. Md. 1991). As an admiralty law theory, this implied warranty applies only to admiralty contracts, specifically admiralty service contracts. *See Chisholm v. UHP Projects, Inc.*, 205 F.3d 731, 734 (4th Cir. 2000) ("The implied warranty of workmanlike performance ensures that the stevedore will warrant the quality of services while on board the vessel."); *see also MP Leasing Corp. v. Colonna's Shipyard*, CIV. A. 2:07CV273, 2009 WL 2581575, ay *4 (E.D. Va. May 8, 2009) ("The warranty imposed on a contractor in admiralty is to effect ship repairs in a workmanlike manner.").

As briefly discussed *supra*, a contract for the sale of a vessel is a non-maritime contract. *Ace American*, 587 F. Supp. 2d at 704 ("It is well established that the contract for the sale of a yacht is a non-maritime contract." (*citing Flota Maritime Browning de Cude, Sociadad Anonima v. Snobl*, 363 F.2d 733, 735 (4th Cir. 1966))). Federal alleges no services on behalf of either Defendant while the vessel was docked or traveling in navigable waters. *See Marina One, Inc. v. Jones*, 29 F. Supp. 3d 669, 675 (E.D. Va. 2014) ("Because the Agreement governs the temporary dockage of a vessel at a marina with access to navigable waters, its subject matter is clearly maritime in nature and it is therefore subject to federal admiralty law."). As the contracts at issue are not maritime contracts, the implied warranty of workmanlike performance does not apply. Plaintiff thus fails to state a claim for which relief may be

granted in Counts V and X. Defendant Mathews's Motion to Dismiss is GRANTED as to Count V and Defendant Alban's Motion to Dismiss is GRANTED as Count X.

## CONCLUSION

For the reasons stated above, Defendant Mathews' Motion to Dismiss (ECF No. 9) is GRANTED and Defendant Alban's Motion to Dismiss (ECF No. 11) is GRANTED. Accordingly, this case is DISMISSED as to all defendants.

A separate Order follows.

Dated: August 14, 2015

_____/s/_____
Richard D. Bennett
United States District Judge